## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| JEFF HUANG, JIMMY CHANG, and MITCHELL SKLARE, on behalf of themselves and all others similarly situated, | CASE NO. |
| | CLASS ACTION |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| v. | |
| TGC, LLC, GOLFNOW, LLC, and NBCUNIVERSAL MEDIA, LLC d/b/a GOLFPASS | |
| Defendants. | |

## COMPLAINT

## I.    INTRODUCTION

1.    This case arises from the surreptitious disclosure of subscribers' personally identifiable information in violation of the Video Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710, by Defendants TGC, LLC, GolfNow, LLC, and NBCUniversal Media, LLC d/b/a GolfPass (together, "Defendants").

2.    Specifically, Defendants used a "Pixel" tracking cookie on the GolfPass website to disclose to Meta Platforms, Inc., f/k/a Facebook, Inc. ("Meta," f/k/a "Facebook") a record of its digital subscribers' identities side-by-side with the

specific videos those digital subscribers requested or obtained. Defendants did so without their subscribers' "informed, written consent." *Id.* § 2710(b)(2)(B).

3. Jeff Huang ("Huang"), Jimmy Chang ("Chang") and Mitchell Sklare ("Sklare") (collectively, "Plaintiffs," and individually, a "Plaintiff") are victims of Defendants' misconduct. Without their consent, Defendants disclosed to Meta each Plaintiff's personally identifiable information, including their Facebook ID ("FID"), along with specific video titles and the videos' URLs identifying specific prerecorded videos each Plaintiff requested or obtained (together, "Personal Viewing Information"). Plaintiffs bring this case as a class action, seeking damages and equitable relief on behalf of themselves and all others similarly situated.

## II. PARTIES

4. Plaintiff Jeff Huang resides in Louisville, Kentucky, where he intends to remain. Plaintiff Huang was a paid subscriber to GolfPass, which is operated by Defendants, from November 2019 through at least November 2023.

5. Plaintiff Jimmy Chang resides in Peachtree Corners, Georgia, where he intends to remain. Plaintiff Chang has been a paid subscriber to GolfPass, which is operated by Defendants, since May 2020.

6. Plaintiff Mitchell Sklare resides in Lukeville, Arizona, where he intends to remain. Plaintiff Sklare has been a paid subscriber to GolfPass, which is operated by Defendants, since June 2022.

2

7.     Defendant TGC, LLC ("TGC") is a Delaware limited liability company with its principal address located at 7580 Golf Channel Drive, Orlando, Florida 32819.

8.     Defendant GolfNow, LLC ("GolfNow") is a Florida limited liability company with its principal address located at 7580 Golf Channel Drive, Orlando, Florida 32819.

9.     Defendant NBCUniversal Media, LLC ("NBCUniversal Media") is a Delaware limited liability company with its principal address located at 30 Rockefeller Plaza, New York, New York 10112.

10.    Together, TGC, GolfNow, and NBCUniversal Media do business as GolfPass, a video streaming service that offers subscriptions and provides prerecorded video content to its subscribers. GolfPass's website states that GolfPass is located at 7580 Golf Channel Drive, Orlando, Florida 32819.

## III.   JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because this action arises under the VPPA, 18 U.S.C. § 2710.

12.    This Court has personal jurisdiction because TGC and GolfNow maintain their principal places of business in this District. This Court also has personal jurisdiction because NBCUniversal Media has sufficient minimum contacts with this District in that it directs, markets, and provides GolfPass's services in this

District and makes GolfPass available to residents of this District for those interested in entering into contracts over the internet. Indeed, the GolfPass website allows residents of this District to enter into transactions utilizing the GolfPass website. During the relevant time period, Defendants, including NBCUniversal Media, entered into contracts with residents of this District that involved the knowing and repeated transmission of computer data over the internet. This resulted in Defendants, including NBCUniversal Media, accepting benefits from residents of this District through the GolfPass website. Plaintiffs' and the Class members' claims arise directly from the operation of the GolfPass website.

13.     Venue is proper in this Court because Defendants represent that GolfPass is in this District.[1]

## IV.   FACTUAL ALLEGATIONS

### A.   Background of the VPPA

14.     The VPPA generally prohibits the knowing disclosure of information that identifies a consumer as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(b)(1).

15.     Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per violation), punitive damages, equitable

---

[1] https://www.golfpass.com/terms-of-use ("GolfPass is located at 7580 Golf Channel Drive, Orlando, FL 32819") (last visited January 31, 2024).

relief, reasonable attorneys' fees, and other reasonably incurred litigation costs. *Id.*
§ 2710(c)(2).

16.    The VPPA was initially passed in 1988 to protect the privacy of
individuals' and their families' video rental, purchase, and viewing data. Leading up
to its enactment, members of the United States Senate warned that "[e]very day
Americans are forced to provide to businesses and others personal information
without having any control over where that information goes." S. Rep. No. 100-599
at 7-8 (1988).

17.    Senators at the time were particularly troubled by disclosures of records
that reveal consumers' purchases and rentals of videos and other audiovisual
materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized,
records of this nature offer "a window into our loves, likes, and dislikes[,]" such that
"the trail of information generated by every transaction that is now recorded and
stored in sophisticated record-keeping systems is a new, more subtle and pervasive
form of surveillance." *Id*. at 7-8.

18.    In proposing the Video and Library Privacy Protection Act (later
codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to
privacy protects the choice of movies that we watch with our family in our own
homes. And it protects the selection of books that we choose to read." 134 Cong.
Rec. S5399 (May 10, 1988). Thus, the personal nature of such information and the

need to protect it from disclosure inspired the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

19.     These statements rang true in 1988 when Congress passed the VPPA, and even more so today, in the modern era of data mining and online video content in which most Americans partake. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

20.     In this case, Defendants chose to deprive Plaintiffs and class members of their rights under the VPPA by systematically disclosing their Personal Viewing Information to Meta, without providing and obtaining from Plaintiffs and class members informed, written consent.

---

[2] *See* Statement of the Honorable Patrick Leahy, United States Senator, January 31, 2012, https://www.judiciary.senate.gov/imo/media/doc/leahy_statement_01_31_12.pdf (last visited January 31, 2024).

**B.      Defendants Offer Prerecorded Video Materials Through GolfPass**

21.    Defendants offer an online video-streaming service that offers prerecorded video materials to subscribers, as described at www.golfpass.com.

**C.      Defendants Embedded the Pixel on the GolfPass Website and Knowingly Disclosed Subscribers' Personal Viewing Information to Meta**

22.    Defendants intentionally deployed the "Meta Pixel" or "Pixel" on the GolfPass website, programmed it to collect and transmit information regarding subscriber's video viewing, and did so to profit, directly or indirectly, from advertising and information services, knowing that the Pixel would transmit subscribers' personally identifiable information to Meta.

**1.      The Meta Pixel**

23.    Facebook introduced its Pixel tracking tool in 2013 to allow online businesses like that of Defendants to track the actions of their customers on their respective websites and to build detailed, valuable profiles about them.[3] Once activated, the Meta Pixel "tracks the people and type of actions they take,"[4] including

---

[3] Meta for Developers, Meta Pixel, https://developers.facebook.com/docs/meta-pixel/ (last visited January 31, 2024).

[4] Meta, Retargeting, https://www.facebook.com/business/goals/retargeting (last visited January 31, 2024).

each page users' visit, what buttons they click, as well as specific information that users input into a website.[5]

24.     Meta explains to companies that installing the Pixel allows them to "track Facebook ad-driven visitor activity on [their] website" and enables Facebook "to match . . . website visitors to their respective Facebook User accounts."[6]

25.     Once a company installs the Meta Pixel on its website, the Pixel tracks users as they navigate through the website and logs a variety of information designated for tracking by the company, including pages visited, any website "buttons" they click, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[7]

26.     During the installation process, Defendants chose certain options from a menu of available "events" that track specific user activity on www.golfpass.com for automatic disclosure to Meta, including personally identifiable information such as a user's FID, a unique and persistent identifier Facebook assigns to each Facebook

---

[5] Meta, Business Help Center, About Meta Pixel, https://www.facebook.com/business/help/742478679120153 (last visited January 31, 2024).

[6] Meta for Developers, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited January 31, 2024).

[7] Meta for Developers, Meta Pixel, https://developers.facebook.com/docs/meta-pixel/ (last visited January 31, 2024).

user. Defendants chose for GolfPass to disclose to Meta its subscribers' unencrypted FIDs within a "c_user cookie."

27.     Any ordinary person who has access to this FID can use this identifier to easily locate, access, and view a user's corresponding Facebook profile, as well as the specific video content the user requested or obtained on GolfPass. One simply needs to log into Facebook and type www.facebook.com/[FID]/ to identify the user. For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4/ in the web browser retrieves Mark Zuckerberg's Facebook page, www.facebook.com/zuck, and additional personally identifiable information contained therein.

28.     Defendants easily could program GolfPass to ensure that this information is not disclosed to Meta.

### 2.     Defendants Used the Meta Pixel to Disclose Digital Subscribers' Personal Viewing Information From GolfPass to Meta

29.     Defendants embedded Meta Pixel on the GolfPass website to disclose its subscribers' identities and video viewing histories to Meta.

30.    In the example below, user "John Smith" is requesting or obtaining Defendants' video titled "S1 E6: Nepo babies, golf wedding toast disaster, and David Leadbetter."[8]



31.    As can be seen below, when a user clicks on and requests a video on relevant portions of the GolfPass website, Defendants disclose to Meta whether a video was requested (in contrast to the user requesting non-video material), the specific video name that the subscriber requested, the fact that the subscriber requested or obtained the specific video, the URL, and the subscriber's FID to Facebook in a single transmission:

---

[8] For purposes of demonstrating in this Complaint Defendants' practice of disclosing consumers' personally identifiable information, Plaintiffs created and used an exemplary Facebook account for "John Smith."



32.     The FID is displayed in the "c_user" code. In this example, the "c_user" code is 61554643471756. The disclosure of the FID is coupled with the title of the video the subscriber requested or obtained along with the URL for the video:

**Video Name:**



**Digital Subscriber's FID:**

c_user=61554643471756;

33.     Any person can specifically identify the user requesting or obtaining the GolfPass video titled "S1 E6: Nepo babies, golf wedding toast disaster, and David Leadbetter" by simply entering facebook.com/61554643471756 into their search bar. On pressing enter, John Smith's Facebook page automatically appears:



34. Defendants violated the VPPA by knowingly disclosing to Meta subscribers' FIDs, together with the specific video materials they requested or obtained.

**D. Defendants Did Not Obtain Consent From Their Various Digital Subscribers to Disclose the Subscribers' Personal Viewing Information to Meta**

35. When Defendants' subscribers opened accounts with Defendants, Defendants did not inform their digital subscribers that subscribers' Personal Viewing Information and FID would be shared with Meta, and Defendants did not obtain their digital subscribers' consent to such information sharing.

36. As is the case at the time of registration, digital subscribers were not provided with any notification that their Personal Viewing Information was being

shared when they logged in to their GolfPass accounts and requested or obtained specific prerecorded videos. Defendants also failed to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

37.     Defendants did not seek or obtain their digital subscribers' consent (in writing or otherwise) before surreptitiously disclosing subscribers' Personal Viewing Information to Meta.

### E.     Plaintiffs' Experiences

#### 1.     Plaintiff Jeff Huang

38.     Plaintiff Jeff Huang was a paid GolfPass subscriber from November 2019 through at least November 2023. Huang became a paid GolfPass subscriber by registering for an account and providing, among other information, his name, email address, and payment information to Defendants. Defendants provided Huang with a username and password to log into his account.

39.     At all times relevant hereto, Huang had a Facebook account that contained his personal information, including his name. Huang regularly requested or obtained pre-recorded video materials and/or services from Defendants via a browser through www.golfpass.com. Thus, disclosure of Huang's FID resulted in the sharing of his personal information.

40.     Defendants knowingly disclosed to Meta Huang's FID coupled with the specific titles of prerecorded video material and/or services Huang requested or obtained, and URLs to access those videos.

41.     Each time Defendants knowingly disclosed Huang's Personal Viewing Information to Meta, they violated Huang's rights under the VPPA.

42.     Huang never provided informed, written consent to Defendants that complied with the VPPA to disclose his Personal Viewing Information to Meta.

43.     Defendants never provided Huang with written notice that they had disclosed his Personal Viewing Information, or any means of opting out of such disclosure. Defendants nonetheless disclosed Huang's Personal Viewing Information to Meta.

### 2.     Plaintiff Jimmy Chang

44.     Plaintiff Jimmy Chang has been a paid GolfPass subscriber since May 2020. Chang became a paid GolfPass subscriber by registering for an account and providing, among other information, his name, email address, and payment information to Defendants. Defendants provided Chang with a username and password to log into his account.

45.     At all times relevant hereto, Chang had a Facebook account that contained his personal information, including his name. Chang regularly requested or obtained pre-recorded video materials and/or services from Defendants via a

browser through www.golfpass.com. Thus, disclosure of Chang's FID resulted and results in the sharing of Chang's personal information.

46.     Defendants knowingly disclosed to Meta Chang's FID coupled with the specific titles of prerecorded video material and/or services Chang requested or obtained, and URLs to access those videos.

47.     Each time Defendants knowingly disclosed Chang's Personal Viewing Information to Meta, it violated Chang's rights under the VPPA.

48.     Chang never provided informed, written consent to Defendants that complied with the VPPA to disclose his Personal Viewing Information to Meta.

49.     Defendants never provided Chang with written notice that they had disclosed Chang's Personal Viewing Information, or any means of opting out of such disclosure.    Defendants    nonetheless    disclosed    Chang's    Personal    Viewing Information to Meta.

### 3.     Plaintiff Mitchell Sklare

50.     Plaintiff Mitchell Sklare has been a paid GolfPass subscriber since June 2022. Sklare became a paid GolfPass subscriber by registering for an account and providing, among other information, his name, email address, and payment information to Defendants. Defendants provided Sklare with a username and password to log into his account.

51.     At all times relevant hereto, Sklare had a Facebook account that contained his personal information, including his name. Sklare regularly requested or obtained pre-recorded video materials and/or services from Defendants via a browser through www.golfpass.com. Thus, disclosure of Sklare's FID resulted and results in the sharing of Sklare's personal information.

52.     Defendants knowingly disclosed to Meta Sklare's FID coupled with the specific titles of prerecorded video material and/or services Sklare requested or obtained, and URLs to access those videos.

53.     Each time Defendants knowingly disclosed Sklare's Personal Viewing Information to Meta, they violated Sklare's rights under the VPPA.

54.     Sklare never provided informed, written consent to Defendants that complied with the VPPA to disclose his Personal Viewing Information to Meta.

55.     Defendants never provided Sklare with written notice that they had disclosed Sklare's Personal Viewing Information, or any means of opting out of such disclosure.    Defendants    nonetheless    disclosed    Sklare's    Personal    Viewing Information to Meta.

## V.      CLASS ACTION ALLEGATIONS

56.     Plaintiffs bring this lawsuit pursuant to Federal Rule of Civil Procedure 23 on behalf of the following class (the "Class"):

> All persons in the United States who subscribed to GolfPass,
> requested or obtained prerecorded video materials or services on

17

GolfPass's website via a browser, used Facebook during the time the Pixel was active on GolfPass's website, and whose Personal Viewing Information Defendants disclosed to Meta.

57.    The "Class Period" is from February 6, 2022 to the present.

58.    Excluded from the Class are: (a) Defendants and their employees, officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

59.    *Numerosity.* The Class is so numerous that individual joinder is impracticable. On information and belief, GolfPass has at least tens of thousands of subscribers, many of whom have requested or obtained specific video content. On information and belief, Defendants disclosed to Meta the Personal Viewing Information of a substantial portion of those subscribers in violation of the VPPA. The Class therefore consists of thousands of class members—far too many for individual joinder.

60.    *Typicality.* Plaintiffs' claims are typical of the Class they seek to represent. Plaintiffs, like all Class members, had their personal viewing information knowingly disclosed to Meta by Defendants without Plaintiffs' or the Class members' informed written consent. Plaintiffs' claims arise out of the same conduct and are based on the same legal theories as those of any absent Class members.

61.   *Adequacy of Class Representatives.* Plaintiffs will fairly and adequately protect the interests of the Class. They are aware of their duties to absent Class members and are determined to faithfully discharge their responsibilities. Plaintiffs' interests are aligned with (and not antagonistic to) the interests of the Class.

62.   *Adequacy of Counsel.* In addition, Plaintiffs have retained competent counsel with considerable experience in privacy class actions and other complex litigation. Plaintiffs' counsel have done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class.

63.   *Commonality and Predominance.* This case presents numerous questions of law and fact with answers common to the Class that predominate over questions affecting only individual class members. Those common questions include:

  a.   Whether Defendants disclosed Class members' Personal Viewing Information to Meta;

  b.   Whether Defendants' disclosure of Class members' Personal Viewing Information to Meta was knowing under the VPPA;

  c.   Whether the information disclosed to Meta concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA; and

  d.   Whether Class members are entitled to statutory damages and equitable relief as a result of Defendants' conduct.

64.   *Superiority and Manageability.* A class action is superior to individual adjudications because joinder of all Class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount in controversy for each individual Class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class member.

65.   *Injunctive Relief.* Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendants acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

66.   *Ascertainability.* Class members are sufficiently ascertainable by the fact that each Class members has a unique account with Defendants, which can be identified by, among other things, each class member's name and email address, and each class member has a unique account username and password. Further each Class member's personal viewing information was knowingly disclosed to Meta by Defendants without their informed written consent.

67.   *Particular Issues.* Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular

issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## VI.   FRAUDULENT CONCEALMENT AND TOLLING

68.   The applicable statutes of limitations are tolled by virtue of Defendants' knowing and active concealment of the facts alleged above. Plaintiffs and Class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

69.   At the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs and the Class. Defendants therefore are estopped from relying on any statute of limitations.

70.   Defendants' fraudulent concealment is common to the Class.

## VII.  CAUSE OF ACTION

### First Cause of Action
### Violations of the Video Privacy Protection Act, 8 U.S.C. § 2710

71.   Plaintiffs incorporate by reference all of the above allegations.

72.   Plaintiffs bring this cause of action on behalf of the Class.

73.   The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer[.]" 18 U.S.C. § 2710(b)(1); *id.* § 2710(b)(2)(B).

74.     A "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" *Id.* § 2710(a)(4). Defendants, therefore, are "video tape service provider[s]," because they are engaged in the business of delivering audio visual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

75.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" As alleged above, Plaintiffs and Class members are subscribers to Defendants' service, which provides video content. Thus, Plaintiffs and Class members are "consumers" under this definition.

76.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information that identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]"

77.     Defendants knowingly disclosed Plaintiffs' and Class members' Personal Viewing Information—specifically, their FIDs and the title and URL of the videos they requested or obtained—to Meta.

78.     This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and each Class member

to Meta as an individual who requested or obtained Defendants' video content, including the specific video materials requested or obtained on the GolfPass website. Indeed, anyone with an FID could identify the individual associated with it simply by entering "facebook.com/[FID]" into a web browser.

79.    Under the VPPA, "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer"; and (2) "at the election of the consumer" is either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner[.]" *Id.* § 2710(b)(2)(B). Defendants failed to obtain informed, written consent under this definition.

80.    In addition, the VPPA creates an opt-out right for consumers. *Id.* § 2710(b)(2)(B)(iii). It requires video-tape service providers like Defendants to also "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election[.]" *Id.* Defendants failed to provide an opportunity to opt out as required by the VPPA.

81.    Defendants knowingly disclosed Plaintiffs' and Class members' Personal Viewing Information to Meta. Defendants programmed the Meta Pixel into

23

their website code, knowing that Meta would receive specific video titles and the subscribers' FIDs when subscribers requested or obtained videos.

82.   By disclosing Plaintiffs' and Class members' Personal Viewing Information, Defendants violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits.

83.   As a result of the above violations, Defendants are liable to Plaintiffs and other Class members for liquidated damages in an amount of $2,500 per violation. *Id.* § 2710(c)(2)(A). Under the statute, Defendants are also liable for reasonable attorneys' fees and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendants in the future. *Id.* § 2710(c)(2).

## VIII.  PRAYER FOR RELIEF

84.   Plaintiffs, individually and on behalf of all others similarly situated, hereby request that the Court:

a.   Certify the Class;

b.   Appoint Plaintiffs as Class representatives and appoint Plaintiffs' counsel to represent the Class;

c.   Find that Defendants' actions, as described herein, constitute violations of the VPPA;

d.   Award liquidated damages in an amount of $2,500 per violation for each violation to each Plaintiff and each Class member;

e.   Award punitive damages in an amount to be determined at trial;

24

f.   Award reasonable attorneys' fees and reimbursement of litigation expenses;

g.   Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

h.   Enter judgment in favor of Plaintiffs and the Class;

i.   Enjoin Defendants' ongoing misconduct, enter any equitable relief it deems appropriate, and award restitution in an amount sufficient to disgorge Defendants' ill-gotten gains; and

j.   Award any other relief the Court deems just and proper.

## IX.   DEMAND FOR JURY TRIAL

85.   Plaintiffs demand a jury trial on all applicable claims.

Dated: February 6, 2024

Respectfully submitted,

LEVIN LAW, P.A.

*/s/ Brandon T. Grzandziel*
Brian Levin, Fla. Bar No. 26392
Brandon T. Grzandziel, Fla. Bar No. 58732
2665 South Bayshore Drive, PH2
Miami, FL 33133
Telephone: (305) 402-9050
Facsimile: (305) 676-4443
brian@levinlawpa.com
brandon@levinlawpa.com
sarah@levinlawpa.com
(secondary e-mail address)

-and-

DIMOND KAPLAN & ROTHSTEIN, P.A.

Jeffrey B. Kaplan, Fla Bar No. 39977

2665 South Bayshore Drive, PH2B
Miami, FL 33133
Telephone: (305) 375-1920
Facsimile: (305) 374-1961
jkaplan@dkrpa.com

*Counsel for Plaintiffs and*
*the Proposed Class*