**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JEFF HUANG, JIMMY CHANG, and MITCHELL SKLARE, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

TGC, LLC, GOLFNOW, LLC, and NBCUNIVERSAL MEDIA, LLC d/b/a GOLFPASS

Defendants.
_______________________________________/

**Civil Action No. 6:24-cv-00270-PGB-LHP**

# DEFENDANTS' MOTION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

INTRODUCTION........................................................................................1
FACTUAL BACKGROUND ........................................................................3
A. GolfPass and its Website........................................................................3
B. Plaintiffs' GolfPass Subscriptions.........................................................4
C. GolfPass Terms, Arbitration Provision, and Class Waiver ...........................8
ARGUMENT...........................................................................................10
I. The Court Must Compel Arbitration ........................................................ 12
A. Plaintiffs and GolfPass Entered a Valid Agreement to Arbitrate...... 12
B. GolfPass's Delegation Clause Dictates that the Scope of the Arbitration Agreement Should be Decided by the Arbitrator...........15
C. Plaintiffs' Claims Are Within the Scope of the Arbitration Agreement. ........................................................................ 18
D. GolfPass Has Not Waived Its Right to Arbitration .......................... 19
II. Upon Compelling Arbitration, This Court Should Dismiss the Complaint.........................................................................................20
CONCLUSION ........................................................................................ 21

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Adams v. Lashify, Inc.*,
2023 WL 5573822 (M.D. Fla. Aug. 29, 2023) (Byron, J.) ............................... 14

*Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*,
524 F.3d 1235 (11th Cir. 2008)....................................................................11

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ....................................................................................11

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ................................................................................... 18

*Bachewicz v. JetSmarter, Inc.*,
2019 U.S. Dist. LEXIS 71345 (S.D. Fla. Apr. 29, 2019) (Bloom, J.)................. 14

*Caley v. Gulfstream Aerospace Corp.*,
428 F.3d 1359 (11th Cir. 2005)...................................................................20

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) ..................................................... 12

*Cervello v. Wacko's Too, Inc.*,
2018 WL 1763646 (M.D. Fla. Jan. 31, 2018)...................................................17

*Citibank, N.A. v. Stok & Assocs., P.A.*,
387 F. App'x 921 (11th Cir. 2010) (per curiam)............................................. 19

*Cruz v. Cingular Wireless, LLC*,
648 F.3d 1205 (11th Cir. 2011) ....................................................................11

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ....................................................................................11

*Derriman v. Mizzen & Main LLC*,
2023 WL 9022723 (M.D. Fla. Dec. 29, 2023)...........................................12, 13

*Dye v. Tamko Bldg. Prod., Inc.*,
908 F.3d 675 (11th Cir. 2018) ..................................................................... 13

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ................................................................................... 12

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
139 S. Ct. 524 (2019) .......... 15, 16

*Jackson v. Maria D's, Inc.*,
2021 WL 2868042 (M.D. Fla. May 5, 2021) .......... 20

*JPay, Inc. v. Kobel*,
904 F.3d 923 (11th Cir. 2018) .......... 16, 17

*Kaiser v. Alexander Marine USA*,
2023 WL 6494779 (M.D. Fla. Aug. 18, 2023) .......... 18

*Massage Envy Franchising, LLC v. Doe*,
339 So. 3d 481 (Fla. 5th DCA 2022) .......... 13, 14

*Mercury Telco Grp., Inc. v. Empresa De Telecommunicaciones De Bogota S.A. E.S.P.*,
670 F. Supp. 2d 1350 (S.D. Fla. 2009) .......... 18, 20

*MetroPCS Commc'ns, Inc. v. Porter*,
273 So. 3d 1025 (Fla. 3d DCA 2018) .......... 13

*Ministerio Intl El Rey Jesus, Inc. v. Lloyd's*,
2020 WL 9172658 (M.D. Fla. Oct. 26, 2020) (Byron, J.) .......... 11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .......... 12

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) .......... 15

*Salco Distribs., LLC v. iCode, Inc.*,
2006 WL 449156 (M.D. Fla. Feb. 22, 2006) .......... 13

*Segal v. Amazon.com, Inc.*,
763 F. Supp. 2d 1367 (S.D. Fla. 2011) .......... 13

*Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*,
432 F.3d 1327 (11th Cir. 2005) .......... 17

*Universal Kidney Ctr., Inc. v. Indep. Specialty Ins. Co.*,
2023 WL 7411713 (M.D. Fla. Oct. 3, 2023) .......... 16

*Valiente v. StockX, Inc.*,
645 F. Supp. 3d 1331 (S.D. Fla. 2022) .......... 11, 14

*Wechel v. Regions Bank*,
2019 WL 13245746 (M.D. Fla. Nov. 17, 2019) ....................................................20

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* .............................................................. 1

9 U.S.C. § 2 ..........................................................................................................11

9 U.S.C. § 4 ..........................................................................................................11

Video Privacy Protection Act, 18 U.S.C. § 2710 ......................................................... 1

**Other Authorities**

JAMS Streamlined Arb. Rules and Proc., Rule 8.b (June 1, 2021) ..........................17

Defendants TGC, LLC ("TGC"), GolfNow, LLC ("GolfNow"), and NBCUniversal Media, LLC d/b/a GolfPass ("GolfPass," and together with TGC and GolfNow, "Defendants"), through undersigned counsel, hereby move this Court to compel arbitration and dismiss the instant proceedings without prejudice under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA").

**INTRODUCTION**

GolfPass offers a website, www.golfpass.com (the "GolfPass Website"), that offers subscriptions to various golf-related material. Like many websites, users who purchase a subscription to GolfPass must agree to GolfPass's Terms and Conditions ("Terms"). Those Terms prominently disclose—in all capital letters at the top of the first page—that users are required to resolve any and all disputes with GolfPass through individual arbitration.

On February 6, 2024, Plaintiffs Jeff Huang, Jimmy Chang, and Mitchell Sklare (together, "Plaintiffs") filed the class action complaint ("Complaint") in this case alleging Defendants violated the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), by disclosing their identities and the videos they watched on the GolfPass Website to Facebook. *See* Compl. (ECF 1). In doing so, Plaintiffs disregarded their agreement to resolve their disputes with Defendants through individual arbitration. The facts make clear that Plaintiffs agreed to GolfPass's Terms, including the arbitration agreement and class action waiver. Each Plaintiff took substantially similar steps to purchase his GolfPass subscription: navigating to a page offering a GolfPass subscription, selecting a GolfPass

subscription type, then navigating to a checkout page and entering contact and mailing information. Prior to completing his subscription purchase, each Plaintiff was **required** to affirmatively check a box next to a statement indicating that he agreed to GolfPass's hyperlinked Terms. Plaintiffs could not complete their subscription purchases without checking this box.

Scores of courts have enforced agreements like GolfPass's that require users to affirmatively manifest their assent to contractual terms, often referred to as "clickwrap" agreements. This Court should do the same and compel Plaintiffs to arbitrate their VPPA claims on an individual basis as they agreed they would.

***First***, Plaintiffs assented to and are bound by GolfPass's Terms. GolfPass not only disclosed its Terms on the checkout page and made them accessible through a direct hyperlink, it **required** Plaintiffs to affirmatively check a box manifesting their assent to the Terms—including the arbitration agreement and class action waiver.

***Second***, the parties' arbitration agreement clearly and unmistakably delegates "any dispute arising under or relating to the validity, interpretation, applicability, enforceability or formation of these Terms and/or these arbitration provisions... including but not limited to any claim that all or any part of these Terms is void or voidable" to the arbitrator exclusively. Thus, not only is Plaintiffs' VPPA claim subject to arbitration, but so too are any challenges to the applicability or scope of the arbitration clause. An arbitrator, not this Court, should resolve those issues.

***Third***, even if it were this Court's responsibility to decide questions of arbitrability, the Court should enforce the arbitration agreement because there can be no meaningful dispute that Plaintiffs' VPPA claim falls within its scope. GolfPass's arbitration provision not only broadly encompasses "any disputes or disagreements" between subscribers and GolfPass, but also specifically encompasses disputes regarding "any data or information" Plaintiffs may have provided to GolfPass or that GolfPass may have gathered from Plaintiffs. The allegations in the Complaint fall squarely within this description.

***Finally***, because Plaintiffs agreed to arbitrate the entirety of their disputes—including threshold issues of arbitrability and scope—the Court should direct the parties to proceed in arbitration and dismiss the Complaint.

## FACTUAL BACKGROUND

### A. GolfPass and its Website

The GolfPass Website offers users access to a wide variety of golf-related content, such as archival footage, instructional materials, and special offers. *See* Declaration of Brian Pugh ("Pugh Decl.") ¶ 3. Among the content available on the GolfPass Website is streaming video. Compl. ¶ 21. The GolfPass website is made available by Defendants TGC and GolfNow. Pugh Decl. ¶ 4. Both TGC and GolfNow are wholly owned subsidiaries of NBCUniversal Media, LLC. *See* ECF 19. As described in the Complaint, "[t]ogether, TGC, GolfNow, and NBCUniversal Media do business as GolfPass." Compl. ¶ 10.

Like many websites, GolfPass also offers users the option of purchasing a subscription to the website. Pugh Decl. ¶ 5. Among other things, a GolfPass subscription allows users to access curated golf instructional materials, offers convenient tee time booking, and discounts off of various golf products. *Id.* ¶ 5. Users can purchase GolfPass subscriptions in various ways. *Id.* ¶ 6. For example, they can purchase subscriptions directly on the GolfPass Website. *Id.* ¶ 6. They can also purchase GolfPass subscriptions via Defendants' GolfNow website (the "GolfNow Website"), an online tee time reservation service offered by NBCUniversal. *Id.* ¶ 7. Regardless of whether users purchase their GolfPass subscription on the GolfPass Website or via the GolfNow Website they must navigate to a checkout page and affirmatively check a box confirming that they agree to GolfPass's hyperlinked Terms. *Id.* ¶ 6.

**B. Plaintiffs' GolfPass Subscriptions**

All three Plaintiffs admit that they registered for GolfPass accounts and purchased GolfPass subscriptions. *See* ECF No. 1, ¶ 38 ("Huang became a paid GolfPass subscriber by registering for an account and providing, among other information, his name, email address, and payment information to Defendants."); ¶ 44 ("Chang became a paid GolfPass subscriber by registering for an account and providing, among other information, his name, email address, and payment information to Defendants."); ¶ 50 (Sklare became a paid GolfPass subscriber by registering for an account and providing, among other information, his name, email address, and payment information to Defendants."). Plaintiff

Huang purchased his GolfPass subscription on November 2, 2019, via GolfNow.com. Pugh Decl. ¶ 9. Plaintiff Chang purchased his GolfPass subscription on June 11, 2022,[1] also via GolfNow.com. *Id.* ¶ 10. Plaintiff Sklare purchased his GolfPass subscription on January 8, 2024, on the GolfPass Website. *Id.* ¶ 11.

Although the Plaintiffs subscribed at different points in time, they each followed a substantially similar process when purchasing their GolfPass subscriptions. Each navigated to the registration page (on either the GolfPass Website or the GolfNow Website). Once there, each Plaintiff created a GolfPass account by entering his contact information and selecting a password. *Id.* ¶ 16. Next, he was taken to the "Membership Checkout Page" where he entered his credit card information, billing address, and shipping information. *Id.* ¶17. To the right of those fields was a white rectangular box containing total cost of the selected subscription level including estimated taxes. Directly below the subscription total and directly above a button labeled either "Purchase" or "Purchase GolfPass," GolfPass included notice language following a checkbox, indicating that by checking the box, Plaintiffs were agreeing to GolfPass's Terms. *Id.* ¶ 18.

[1] The complaint alleges that Plaintiff Chang has been a "paid GolfPass subscriber since May 2020," (ECF No. 1, ¶ 44), but Plaintiff Chang most recently purchased a "GolfPass+ VIP" subscription in June 2022, and completed the checkout flow associated with this purchase. Pugh Decl. ¶ 10.

More specifically, when he subscribed in 2019, Plaintiff Huang would have been presented with language stating that: "*By checking the box I agree to the GOLFPASS Terms and Conditions." The following image depicts the notice language Plaintiff Huang saw when he purchased his GolfPass subscription:




*See* Pugh Decl. ¶ 19, Ex. 1 (2019 Membership Checkout Page).

When he subscribed in 2022, Plaintiff Chang would have been presented with language stating that "By checking the box and clicking the 'Purchase GolfPass' button, I agree to the GolfPass Subscription Agreement and Benefit Terms." The following image depicts the notice language Plaintiff Chang saw when he purchased his GolfPass subscription:



*See* Pugh Decl. ¶ 20, Ex. 2 (2022 Membership Checkout Page).

When he subscribed in 2024, Plaintiff Sklare would have been presented with language stating that: "By checking the box I agree to the GolfPass Subscription Agreement and Benefit Terms." The following image depicts the notice language Plaintiff Sklare saw when he purchased his GolfPass subscription:




*See* Pugh Decl. ¶ 21, Ex. 3 (2024 Membership Checkout Page). Images of the full Membership Checkout Pages each Plaintiff would have seen are included as Exhibits 1, 2, and 3 to the Pugh Declaration.

On all versions of the Membership Checkout Page, the terms "Terms and Conditions," "Subscription Agreement," and/or "Benefit Terms" were presented in blue contrasting font (with the terms also underlined on the 2024 page) indicating they were hyperlinks. And in each case, those hyperlinks led to

GolfPass's then current version of its Terms. *Id.* ¶ 21. Each Plaintiff thus had the opportunity to click the hyperlinked terms and read the operative Terms, and if he did not wish to agree to the Terms, to abandon his subscription purchase. To complete his GolfPass Subscription purchase, each Plaintiff was **required** to check the box next to the notice statement, confirming that he agreed to the operative Terms. Finally, after entering all of his information and checking the box manifesting his assent to the operative Terms, each Plaintiff clicked the "Purchase GolfPass" (or "Purchase") button to complete his GolfPass subscription transaction.

### C. GolfPass Terms, Arbitration Provision, and Class Waiver

Like the Membership Checkout Pages, the GolfPass Terms in place when each of the Plaintiffs registered were largely similar.[2] Each set of Terms made clear that the GolfPass Website was being offered by TGC and GolfNow and their affiliated companies, which include NBCUniversal. *See* Pugh Decl. Exs. 4, 5, 6, at 1. Each set of Terms also made clear that by using the relevant services, users were agreeing to those Terms. *Id.*

Each set of Terms also prominently disclosed to users that they were assenting to mandatory individual arbitration. Specifically, in the very first section of each set of Terms, Defendants included language informing users that

[2] The operative Terms when each Plaintiff purchased their subscription are included as Exhibits to the Declaration of Brian Pugh. The 2019 Terms apply to Plaintiff Huang, the 2022 Terms apply to Plaintiff Chang, and the 2024 Terms apply to Plaintiff Sklare. All versions of the Terms are referred to collectively as the "Terms."

the Terms included an arbitration provision. For example, the Terms in place 2019 when Plaintiff Huang subscribed stated:

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY BEFORE USING THE GolfPass SERVICES. THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS INCLUDING MANDATORY ARBITRATION, NO CLASS RELIEF AND WAIVER OF YOUR RIGHT TO A JURY TRIAL. By accessing or using any of the GolfPass Services you agree to these Terms. If you do not agree to these Terms, please do not access or use the GolfPass Services.

*See* Pugh Decl. Ex 4.

Similarly, the versions of the Terms in place in 2022 and 2024 when Plaintiffs Chang and Sklare subscribed stated:

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY BEFORE USING THE GolfPass SERVICES. THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS INCLUDING MANDATORY ARBITRATION, NO CLASS RELIEF AND WAIVER OF YOUR RIGHT TO A JURY TRIAL.

*See id.* Exs. 5 & 6.

Each set of Terms then included a full arbitration provision setting forth the parameters of the parties' arbitration agreement. The arbitration provision, titled "Binding Arbitration of All Disputes. No Class Relief," is contained in Section 25 of the 2019 Terms and Section 24 of the 2022 and 2024 Terms. *See* Pugh Decl. ¶¶ 27, 32, 37; Exs. 4-6.

In all versions of the Terms, that section fully sets forth the parties' agreement to arbitrate disputes and the class action waiver. As applicable here, the arbitration provision:

- broadly covers any dispute "regarding (i) [] use of or interaction with the GolfPass Services, (ii) any purchases or other transactions or relationships related to [] use of the GolfPass Services, or (iii) any data or information [a user] may provide to [GolfPass] or that [GolfPass] may gather in connection with such use, interaction or transaction;"

- contains a delegation clause stating that the arbitrator will have exclusive authority "to resolve any dispute arising under or relating to the validity, interpretation, applicability, enforceability or formation of these Terms and/or these arbitration provisions… including but not limited to any claim that all or any part of these Terms is void or voidable;

- identifies JAMS as the arbitration provider and selects the JAMS rules as governing the administration of any arbitration; and

- contains a clear class action waiver advising users that they "will not have the right to bring or participate in any class action or similar proceeding in court or in arbitration."

*See* Pugh Decl. ¶¶ 33, 38; Exs. 5 and 6 (2022 Terms and 2024 Terms).[3]

The Terms further state that they "shall be governed by the laws of the U.S. and the State of New York without regard to its conflicts of law provisions." *Id.*, Exs. 4, 5, and 6.

**ARGUMENT**

Plaintiffs must arbitrate their VPPA claims against GolfPass consistent with their agreements. Under the Federal Arbitration Act ("FAA"), upon a motion by either party to an arbitration agreement, courts must compel arbitration "in accordance with the terms of the agreement" and a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at

[3] The 2019 Terms contain a substantially similar arbitration agreement, covering these same issues. *See* Pugh Decl. ¶ 28, Ex. 4 (2019 Terms).

law or in equity for the revocation of any contract." 9 U.S.C. §§ 2, 4. The FAA embodies the "liberal federal policy favoring arbitration" as another way to resolve disputes and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations and quotation marks omitted). The FAA "requires courts to 'rigorously enforce agreements to arbitrate' according to their terms." *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1210 (11th Cir. 2011) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *accord Concepcion*, 563 U.S. at 339.

Courts faced with a motion to compel arbitration consider three factors: "(1) whether a valid agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived." *Ministerio Intl El Rey Jesus, Inc. v. Lloyd's*, No.6:20-CV-1802-ORL-40DCI, 2020 WL 9172658, at *2 (M.D. Fla. Oct. 26, 2020) (Byron, J.). However, where, as here, the valid arbitration agreement includes a delegation provision sending all threshold issues to the arbitrator, the Court is not required to extend its analysis past the first issue. *See Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1342 (S.D. Fla. 2022). The party seeking to avoid arbitration has the burden of showing the arbitration provision is unenforceable. *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1238 (11th Cir. 2008). Moreover, courts must resolve any "doubts concerning the scope of arbitrable issues … in favor of arbitration, whether the problem at hand is the construction of the contract language itself or

an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Here, Plaintiffs cannot show the arbitration provisions they agreed to are unenforceable as all three factors require Plaintiffs to arbitrate their claims.

# I. The Court Must Compel Arbitration

## A. Plaintiffs and GolfPass Entered a Valid Agreement to Arbitrate

Plaintiffs entered into and are bound by a valid agreement to arbitrate this dispute. When faced with a motion to compel arbitration, the court must first determine whether a valid agreement to arbitrate exists. Because the existence of an arbitration agreement is a threshold question, Florida state contract law applies to this analysis.[4] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 939 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts.").

In Florida a valid contract requires an offer, acceptance, and consideration. *See Derriman v. Mizzen & Main LLC,* No. 8:23-CV-1132-CEH-UAM, 2023 WL 9022723, at *6 (M.D. Fla. Dec. 29, 2023). Contract formation also requires a demonstration of "mutual assent to certain and definite contractual terms." *Id.*

[4] This brief applies Florida law to the question of whether a valid contract exists, consistent with this Court's treatment of similar arbitration provisions. This is in no way meant to waive the New York choice of law provision in the Terms. Moreover, the result would be the same under New York law. *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08 Civ. 5463, 2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) (holding and reiterating that clickwrap agreements are valid and enforceable contracts under New York law)

In the context of online contracts, Florida courts have recognized two types of agreements: browsewrap and clickwrap. *See MetroPCS Commc'ns, Inc. v. Porter,* 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018). A browsewrap agreement exists when a website "merely provides a link to terms and conditions and does not require the purchaser to indicate acknowledgement during the checkout process." *Derriman*, 2023 WL 9022723, at *6. A clickwrap agreement exists where, as here, "a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions" *Id.* Florida courts generally recognize clickwrap agreements as valid and enforceable online contracts. *See Salco Distribs., LLC v. iCode, Inc.*, No. 8:05 CV 642 T 27TGW, 2006 WL 449156, at *2 (M.D. Fla. Feb. 22, 2006) (clickwrap agreements are enforceable and valid forms of contract in Florida and other federal circuits). *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 485 (Fla. 5th DCA 2022) (same).

In addition, provided users have the opportunity to review the contract prior to manifesting their assent, including through the use of a hyperlink, they are considered to be on sufficient notice of the contractual terms. *Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367, 1369 (S.D. Fla. 2011) (enforcing clickwrap agreement where plaintiff failed to read the terms and noting that in "Florida and the federal circuits . . . clickwrap agreements are valid and enforceable contracts"); *Dye v. Tamko Bldg. Prod., Inc.*, 908 F.3d 675, 683 (11th

Cir. 2018) (under Florida law, in most cases, parties are bound by a signed contract, whether or not they read its terms).

As described above, each Plaintiff was presented with a hyperlink to the Terms on the Membership Checkout page. Pugh Decl. ¶¶ 19, 20, 21. Each Plaintiff was required to affirmatively check the box next to the notice language indicating that they agreed to the hyperlinked Terms, which at all times included an arbitration clause, before they clicked the button to complete their subscription purchase. *Id.* Thus, in each case the Terms, including the arbitration agreement and class action waiver, constitute a valid and enforceable clickwrap agreement under Florida law.

Florida federal and state courts regularly enforce arbitration agreements entered into through a registration process like the one Plaintiffs followed. *See Valiente,* 645 F. Supp. 3d at 1339 (holding under Florida law that "there was a valid and enforceable clickwrap agreement containing the Terms and Arbitration Provision" and granting motion to compel arbitration); *Bachewicz v. JetSmarter, Inc.*, No. 18-cv-62570-BLOOM/Valle, 2019 U.S. Dist. LEXIS 71345, at *6-7 (S.D. Fla. Apr. 29, 2019) (compelling arbitration pursuant to clickwrap agreement) (Bloom, J.); *Massage Envy*, 339 So. 3d at 48 (finding a valid and enforceable clickwrap agreement and compelling arbitration where TOU were available via hyperlink and plaintiff clicked the box indicating "I agree.").[5]

---

[5] Even if the Membership Checkout Pages were browsewrap agreements they would still be enforceable because they provide users with reasonably conspicuous notice that by clicking the "Purchase" or "Purchase GolfPass" button they were agreeing to GolfPass's Terms. *Adams v.*

### B. GolfPass's Delegation Clause Dictates that the Scope of the Arbitration Agreement Should be Decided by the Arbitrator

Since a valid arbitration agreement exists, Plaintiffs must arbitrate their claims. However, even if Plaintiffs were to argue that the parties' broad arbitration agreement somehow does not encompass their VPPA claims (such an argument would be incorrect, as discussed below), the delegation clause in the arbitration agreement compels this Court to send the gateway issue of arbitrability to the arbitrator.

Before determining whether the scope of the arbitration agreement encompasses the dispute in question, a court first examines the contract to determine whether the parties have agreed to commit that issue, as well as other threshold or "gateway" issues, to the arbitrator. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."). Arbitrability is a gateway issue and "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529-31 (2019). Parties may delegate these

---

*Lashify, Inc.*, No. 6:23-CV-243-PGB-DCI, 2023 WL 5573822, at *4 (M.D. Fla. Aug. 29, 2023) (Byron, J.) (enforcing browsewrap agreement where language notifying users they were agreeing to terms were placed proximately atop and contrasting with the call to action button).

threshold questions to an arbitrator as long as their arbitration agreement does so in "clear and unmistakable" language. *Id.* at 530 (citation omitted); *JPay, Inc. v. Kobel*, 904 F.3d 923, 930 (11th Cir. 2018) (emphasis added) ("Questions of arbitrability … stay with the court *unless* there is clear and unmistakable evidence that the parties intended to submit such questions to an arbitrator.").

Here, each arbitration agreement contains language clearly and unmistakably delegating the issue of arbitrability to the arbitrator. Indeed, the broad delegation clause states:

> The Arbitrator, and not any federal, state or local court or agency, shall have the exclusive authority to resolve any dispute arising under or relating to the validity, interpretation, applicability, enforceability or formation of these Terms and/or these arbitration provisions …, including but not limited to any claim that all or any part of these Terms is void or voidable.

*See* Pugh Decl. ¶¶ 33, 38 Exs. 5 and 6.[6]

Courts routinely find similar language demonstrates a clear and unmistakable intent to delegate issues of arbitrability. *See, e.g., Universal Kidney Ctr., Inc. v. Indep. Specialty Ins. Co.*, No. 6:23-CV-953-CEM-DCI, 2023 WL 7411713, at *5 (M.D. Fla. Oct. 3, 2023) (arbitration clause stating "[a]ll matters in dispute between you and us …in relation to this insurance, *including this policy's formation and validity*,… shall be referred to an Arbitration Tribunal in the manner described below" unmistakably delegated the question of arbitrability); *Cervello v. Wacko's Too, Inc.*, No. 3:17-CV-1000-J-39JBT, 2018 WL 1763646, at

[6] 2019 Terms contain substantially similar language. *See* Pugh Decl. ¶ 28, Ex. 4

*3 (M.D. Fla. Jan. 31, 2018) (clause stating "[t]he Arbitrator shall have exclusive authority to resolve any and all disputes over the validity of any part of this License", clearly and unmistakably delegated threshold issues to arbitrator.).

Beyond the text of the delegation clause itself, the Eleventh Circuit has also found incorporation of rules that "specifically empower the arbitrator to decide questions of arbitrability" also evidence a "clear and unmistakable" intent to submit threshold questions to the arbitrator. *See JPay*, 904 F.3d at 937 ("[B]y incorporating AAA rules into an agreement, parties clearly and unmistakably evince an intent to delegate questions of arbitrability."). Here, the Terms state the arbitration will be "conducted in accordance with the JAMS Streamlined Arbitration Rules And Procedures in effect at the time the Arbitration is initiated," and include a link to the JAMS rules. *See* Pugh Decl. Exs. 4-6. The publicly available JAMS rules make clear that threshold disputes about arbitrability shall be submitted to the arbitrator. *See* JAMS Streamlined Arb. Rules and Proc., Rule 8.b (June 1, 2021). The incorporation of the JAMS rules in the arbitration agreement further demonstrates the parties' clear and unmistakable intent to delegate threshold issues to the arbitrator. *See also Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005) (incorporation of AAA rules evidenced a clear an unmistakable intent to submit questions of arbitrability to the arbitrator).

### C. Plaintiffs' Claims Are Within the Scope of the Arbitration Agreement

Even if the arbitration agreement did not include a delegation clause, Plaintiffs' VPPA claims clearly fall within the scope of the arbitration agreement and must be sent to the arbitrator.

Even in instances where an arbitration provision does not include a delegation clause sending threshold questions arbitrator, there is still a presumption in favor of arbitrability. The FAA requires courts to compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). For this reason, courts in the Eleventh Circuit regularly find arbitrability when faced with a broad arbitration clause that covers "any" or "all" disputes. *See, e.g.*, *Kaiser v. Alexander Marine USA*, No. 6:23-CV-108-RBD-RMN, 2023 WL 6494779, at *3 (M.D. Fla. Aug. 18, 2023) (compelling arbitration where a broad arbitration provision required arbitration of "any disputes arising out of" the agreement); *Mercury Telco Grp., Inc. v. Empresa De Telecommunicaciones De Bogota S.A. E.S.P.*, 670 F. Supp. 2d 1350, 1355 (S.D. Fla. 2009) (finding an arbitrable dispute where arbitration clause broadly provided for arbitration of "[a]ny dispute between the parties relating to the execution, interpretation, existence, validity, performance, termination, liquidation and other aspects of the Agreement" warranted a presumption of arbitrability).

Here, GolfPass's arbitration clause contains broad language that covers "any disputes or disagreements" between users and GolfPass. Moreover, the provision expressly encompasses disputes related to data a user provides to GolfPass or that GolfPass uses. *See* Pugh Decl. ¶¶ 27, 32, 37; Exs. 4-6. Plaintiffs' sole claim is that GolfPass violates the VPPA because it discloses to Facebook, via the Facebook pixel, Plaintiffs' identities and their activities on GolfPass's website. This allegation falls squarely within both the arbitration provision's broad language ***and*** the specific provision dealing with data because it not only is a disagreement between Plaintiffs and GolfPass, but one that concerns GolfPass's alleged impermissible disclosure of Plaintiffs' data. Thus, even if this Court as opposed to the arbitrator were to examine whether Plaintiffs' claims fall within the arbitration provision, it is clear they do.

### D. GolfPass Has Not Waived Its Right to Arbitration

GolfPass also has not waived its right to arbitrate Plaintiffs' claims. The final issue the court considers is whether GolfPass has waived its right to arbitrate. In determining whether a party has waived its right to arbitrate, courts consider whether, under the totality of the circumstances, the party seeking to compel arbitration has acted inconsistently with its right to arbitrate by, for example, actively participating in litigation. And, if a party has acted inconsistently, the court then considers whether the other party has been prejudiced. *Citibank, N.A. v. Stok & Assocs., P.A.*, 387 F. App'x 921, 924 (11th Cir. 2010) (per curiam) (finding that a bank did not waive its right to arbitrate where

the bank filed an answer to a complaint, but no prejudice to other side was demonstrated); *Jackson v. Maria D's, Inc.*, No. 3:20-CV-1441-BJD-PDB, 2021 WL 2868042, at *4 (M.D. Fla. May 5, 2021) (finding no waiver where case was in its early days and defendant took a passive and defensive role in the litigation), *R&R adopted*, 2021 WL 8200188 (M.D. Fla. June 11, 2021).

GolfPass has taken not taken *any* action inconsistent with its right to arbitrate this matter. Indeed, this action is in its early stages and the instant motion to compel arbitration is GolfPass's first substantive filing. Plaintiffs have in no way been prejudiced by GolfPass's actions, as GolfPass told Plaintiffs it intended to move to compel arbitration when they initially filed the Complaint. Accordingly, GolfPass has not waived its right to arbitration.

## II. Upon Compelling Arbitration, This Court Should Dismiss the Complaint

Once this Court compels arbitration of Plaintiffs' VPPA claims in line with the parties' agreement, no live dispute will remain to be decided in this forum. Although the FAA requires a court to at least stay a case pending arbitration, in this Court, if all claims are subject to arbitration, then the case may be dismissed. *See Wechel v. Regions Bank*, No. 8:19-CV-2285-T-33JSS, 2019 WL 13245746, at *1 (M.D. Fla. Nov. 17, 2019) (quoting *Mercury Telco Grp.*, 670 F. Supp. 2d at 1354 ("A court may dismiss a case where it determines that the claims sued upon are arbitrable under the relevant agreement."); *see also Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1379 (11th Cir. 2005) (affirming dismissal where all claims were subject to arbitration). Plaintiffs' VPPA claims are subject to

arbitration, and they are Plaintiffs' only claims. Accordingly, the instant action should be dismissed.

## CONCLUSION

For the reasons explained above, Defendants respectfully request that the Court order Plaintiffs to arbitrate their claims on an individual basis pursuant to the GolfPass arbitration agreement and dismiss the Complaint without prejudice.

## Local Rule 3.01(g) Certification

Pursuant to Local Rule 3.01(g), I hereby certify that before filing this motion, I conferred with counsel for the opposing party by email on April 1, 2024 in a good faith effort to resolve the issues raised in the motion. Counsel for Plaintiff stated that they did oppose the relief sought herein.

Date: April 2, 2024

*/s/ Nury Siekkinen*

Nury Siekkinen
Florida Bar No. 1015937
**ZWILLGEN PLLC**
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 296-3585
Facsimile: (202) 706-5298
Email: nury@zwillgen.com

*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system on April 2, 2024, and the foregoing document is being served this day on all counsel or parties of record on the Service List below, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

/s/ *Nury Siekkinen*
Nury Siekkinen

Brian Levin
Levin Law, P.A.
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
(305) 613-0318 (Mobile)
(305) 539-0593 (Miami - Direct Dial)
(248) 270-7338 (Bloomfield Hills)
brian@levinlawpa.com

Jeffrey B. Kaplan
Dimond Kaplan & Rothstein, P.A.
2665 S. Bayshore Drive
Suite Ph2b
Miami, FL 33133
305-374-1920
jkaplan@dkrpa.com